**2021 WI App 89**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2020AP2001-CR

Complete Title of Case:

**STATE OF WISCONSIN,**

**PLAINTIFF-RESPONDENT,**

**V.**

**CARL LEE MCADORY,**

**DEFENDANT-APPELLANT.**

| | |
|---|---|
| Opinion Filed: | November 18, 2021 |
| Oral Argument: | October 6, 2021 |
| JUDGES: | Blanchard, P.J., Fitzpatrick, and Graham, JJ. |

Appellant
ATTORNEYS: On behalf of the defendant-appellant, the cause was submitted on the briefs of and oral argument by *Jennifer A. Lohr* of *Lohr Law Office, LLC*, Madison.

Respondent
ATTORNEYS: On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Tara Jenswold*, assistant attorney general, *Emily L. Thompson*, assistant attorney general, and *Joshua L. Kaul*, attorney general. There was oral argument by *John W. Kellis*.

# COURT OF APPEALS
## DECISION
## DATED AND FILED

## November 18, 2021

Sheila T. Reiff
Clerk of Court of Appeals

### NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

---

Appeal No. **2020AP2001-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2016CF26**

IN COURT OF APPEALS

---

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

V.

CARL LEE MCADORY,

  DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Rock County: JOHN M. WOOD, Judge. *Reversed and cause remanded*.

Before Blanchard, P.J., Fitzpatrick, and Graham, JJ.

¶1 BLANCHARD, P.J. A jury found Carl McAdory guilty of two driving-related offenses after hearing evidence that a chemical test of a sample of his blood, drawn after he was arrested following a traffic stop, showed the presence of cocaine and marijuana. The two driving-related offenses were

operating a motor vehicle while intoxicated, in violation of WIS. STAT. § 346.63(1)(a) (2019-20) (which we refer to as "the impaired-by-drugs offense"), and operating with a restricted controlled substance, in violation of § 346.63(1)(am) (which we refer to as "the strict-liability offense").[1] Under the statutory dual prosecution scheme, in this situation there can be only one conviction, not two. *See* § 346.63(1)(c). After the trial, the State elected to move to dismiss the strict-liability offense, and the circuit court entered a conviction on the impaired-by-drugs offense and proceeded to sentencing.[2]

¶2 We address two arguments that McAdory makes on appeal challenging his conviction on the impaired-by-drugs offense. First, he argues that the evidence at trial was insufficient to sustain the conviction. We conclude that the evidence was sufficient. Second, McAdory makes a due process argument based on the following facts: the prosecution misled the jury in its opening statement and closing argument about what the State had to show to prove that he was "under the influence," one element of the impaired-by-drugs offense, and there was no direct correction of these misleading statements; the evidence was

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

The jury also found McAdory guilty of obstructing an officer, contrary to WIS. STAT. § 946.41(1), based on the undisputed fact that he fled from police during the same traffic stop that produced the driving-related counts, and the circuit court entered judgment on a count of operating a motor vehicle after he was aware that his operating privileges had been revoked, contrary to WIS. STAT. § 343.44(1)(b), (2)(ar)2. McAdory does not raise any issue in this appeal about his conviction or sentencing specifically directed at the obstruction or operating after revocation offenses.

[2] We note that the issues we address in this appeal would not have arisen if the State had instead elected to dismiss the impaired-by-drugs offense and asked the circuit court to proceed to sentencing on the strict liability offense.

weak that McAdory operated his car while he was under the influence of cocaine and marijuana; and, over the defense attorney's objection, the circuit court modified the pattern jury instruction for the impaired-by-drugs offense in a manner that created ambiguity regarding the "under the influence" element. We conclude that when these trial events are considered together there is a reasonable likelihood that the State was effectively relieved of its burden to prove that McAdory was "under the influence" of cocaine and marijuana while driving. Based on this violation of his right to due process of law, we reverse and remand for a new trial on the impaired-by-drugs offense.[3]

## BACKGROUND

¶3    The following is a brief overview, with additional details provided in the Discussion section below. A police officer stopped McAdory due to a non-functioning driver's side headlight and, based on subsequent events that included McAdory fleeing from police on foot, ended up placing him under arrest. McAdory consented to a blood draw. A chemical test of the blood sample showed negative results for ethanol (alcohol), but positive results for cocaine and delta-9-tetrahydrocannabinol (THC), the active ingredient in marijuana. Consistent with positions taken by the prosecutor and over the defense attorney's objection, the circuit court modified WIS JI—CRIMINAL 2664 by removing one of three paragraphs of the instruction defining the "under the influence" element of the impaired-by-drugs offense. The jury found McAdory guilty of the impaired-by-

---

[3] Given our conclusion that there was a due process violation, we need not reach a third argument that McAdory makes on appeal, namely, that the conviction on the impaired-by-drugs offense is subject to discretionary reversal pursuant to WIS. STAT. § 752.35 because the real case or controversy was not fully tried.

drugs and strict-liability offenses, and the State dismissed the strict-liability offense at sentencing.[4]

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE

¶4 McAdory argues that the evidence at trial was insufficient to sustain his conviction for the impaired-by-drugs offense. The State contends that the evidence was sufficient. We agree with the State. However, as we explain below, we consider the sufficiency of the evidence issue to be close and that conclusion is pertinent to our due process analysis.[5]

### A. Legal Standards

¶5 Our supreme court has explained the "highly deferential" approach that courts take to jury verdicts when addressing sufficiency challenges:

> The standard for reviewing the sufficiency of the evidence is highly deferential to a jury's verdict, and provides that an appellate court may not overturn a jury's verdict unless the evidence, viewed most favorably to

---

[4] For purposes of sentencing (and unknown to the jury), each of the driving-related counts was an eighth offense under the counting system used to determine the severity of penalties for offenses related to operating while impaired or with a prohibited level of alcohol or other substance in the blood, *see* WIS. STAT. § 343.307(1). But nothing about McAdory's criminal or traffic history beyond the facts of this particular case is pertinent to any issue in this appeal.

[5] We also address the sufficiency issue, even though we reverse the impaired-by-drugs conviction based on a due process violation, because the potential remedies are different for each issue. McAdory is entitled to a new trial based on the due process violation but, if the evidence had been insufficient, the Double Jeopardy Clause would apply and no retrial would be possible. *See State v. Henning*, 2004 WI 89, ¶22, 273 Wis. 2d 352, 681 N.W.2d 871 ("[D]ouble jeopardy principles prevent a defendant from being retried when a court overturns his [or her] conviction due to insufficient evidence.").

> sustaining the conviction, "is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." Accordingly, a defendant challenging the sufficiency of the evidence bears a heavy burden to show the evidence could not reasonably have supported a finding of guilt.

*State v. Beamon*, 2013 WI 47, ¶21, 347 Wis. 2d 559, 830 N.W.2d 681 (citations omitted). A jury "may not indulge in inferences wholly unsupported by any evidence," *State ex rel. Kanieski v. Gagnon*, 54 Wis. 2d 108, 117, 194 N.W.2d 808 (1972), but courts "uphold the conviction if there is any reasonable hypothesis that supports it," *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410.

### B.    Additional Background

¶6    At trial the State called a police officer, a hospital phlebotomist, and a Wisconsin State Crime Laboratory toxicologist. During the testimony of the officer, the State was permitted to show the jury a video recording from the body camera worn by the officer, which displays clear video and audible sound. McAdory waived his right to testify and did not call any witnesses.

¶7    The officer testified as follows. We use footnotes in our summary to refer to aspects of the video recording. One January morning at approximately 2:26 a.m., the officer was on patrol in a squad car. The officer noticed that one front headlight on McAdory's car was not functioning. The officer followed McAdory and activated the squad car's emergency lights. McAdory continued to drive one block and then made a turn, at which time the officer activated his siren and continued trailing McAdory for about one additional block before McAdory pulled over.

5

¶8      The officer approached the car and identified himself to McAdory, who was the only person in the car.[6]  The officer explained that he had pulled McAdory over for the headlight violation.  McAdory acknowledged that he knew that a headlight on the car was out.  McAdory "was acting nervous" and his "[s]peech was slightly slurred."  The officer "could smell an odor of intoxicants coming from his person."  The officer asked McAdory "where he lived and he couldn't give [the officer] an address.  He kept pointing and acted nervous."[7]

¶9      The officer asked McAdory whether he had been drinking. McAdory responded that he had consumed one beer approximately 30 minutes earlier.  The officer asked for identification.  McAdory responded that he "did not have anything with his name on it."  McAdory gave the partially false name of "Gary McAdory."

---

[6] The video reflects that when the officer initially encountered McAdory sitting in the driver's seat, the windshield wipers on the car were activated, even though there was no precipitation at the time.  When the officer commented on this apparent oddity, McAdory can be heard saying something to the effect that the wipers were "broke."

[7] The video could reasonably support the following inferences regarding the officer's trial testimony that McAdory "kept pointing and acting nervous."  While seated in the driver's seat and responding to at least some questions posed by the officer standing next to him, McAdory briefly gestured forward in a manner that did not respond in a meaningful way to the questions posed by the officer.  On a related point, the jury could have found that the video reflects that the officer posed clear questions in a direct and engaging manner that was firm but not aggressive in tone, and that the questions would be readily understood by the average person in McAdory's position.

¶10     The officer returned to his squad car to gather information through a communication system.  While the officer was in his squad car, McAdory twice left his car; the second time, the video reveals, he fled police on foot.[8]

¶11     After McAdory was arrested he consented to an evidentiary chemical test of his blood, which resulted in a blood draw for purposes of testing at the Wisconsin State Crime Laboratory.  There was evidence that the blood draw occurred at 3:05 a.m., which was approximately 39 minutes after the traffic stop.  Police found in the car that McAdory had been driving an open beer can and a form of identification bearing his correct name, belying his claim to the officer that he had no identification.

¶12     Based on his training and experience, the officer testified as follows on the general topic of impairment:

> If somebody is impaired they may slur their speech, have trouble walking.  They may be agitated, fidgety.  Whereas a sober person would just be able to stand still, speak to you in a normal voice.  Sometimes people who are impaired appear to be nervous or unsure of things.  Kind of apprehensive.  Or it appears they are paranoid.  There [are] a lot of different ways people who are impaired act that are different than somebody who is sober or not under the influence of any drug or alcohol.

---

[8] The video reflects the following.  Shortly after the officer returned to his squad car after his initial interactions with McAdory, McAdory got out of his car and started walking toward the squad car, without first having received any indication from the officer that he should do this.  The officer firmly and repeatedly directed McAdory to return to his car and remain there.  McAdory initially complied with that direction.  However, approximately one minute and 54 seconds later, while the officer was still in his squad car, McAdory got out of his car and ran in a direction away from the squad car, without offering any explanation of extenuating circumstances to the officer or any such circumstance appearing on the video.  After a foot chase of approximately 54 seconds, police caught McAdory.  This time he gave police his real name when asked.

The officer also testified to the opinion, based on his training and experience, that McAdory "was impaired when he was operating the vehicle" before the stop. The prosecutor twice asked the officer a generic question: whether based on the officer's training and experience he believed that McAdory "was impaired" at the time of the stop. Both times the officer testified yes. However, neither the questions, nor the answers the officer gave, distinguished among potential sources or causes for a person to be found to be "impaired."

¶13 The hospital phlebotomist testified that she performed the blood draw on McAdory and filled out corresponding paperwork for transmission to police and laboratory analysts.

¶14 The Wisconsin State Crime Laboratory toxicologist testified as follows. His specific job classification at the time of trial was "controlled substances analyst." In that position, he "analyze[s] solid, liquid, plant forms of evidence for the presence of controlled substances." He performed a test on McAdory's blood sample, which "confirmed positive for cocaine as well as three metabolites" of cocaine, including cocaethylene. A "metabolite is basically a break[-]down product of the parent drug or possibly other metabolites that it breaks down into." Cocaethylene is formed in the body only when both alcohol and cocaine are present. Cocaine generally remains in a person's blood for two to eight hours after ingestion. The test of McAdory's blood was also positive for THC. In contrast, alcohol was not found in McAdory's blood sample.

¶15 One exhibit introduced at the time of the toxicologist's testimony, and published to the jury, was a report that the toxicologist authored which listed the following as confirmed substances in McAdory's blood sample: cocaine,

THC, and substances that the parties do not dispute were metabolites of cocaine or THC.

¶16   The toxicologist was not asked to testify to knowledge he might have regarding specific effects of cocaine or of THC on the ability to safely operate a motor vehicle, either in general or as opposed to the effects of alcohol. Nor did he testify about combined effects in a person who has consumed cocaine, THC, and alcohol.  He did not testify in any manner about the significance of the specific levels of the controlled substances in the blood sample.  Although not addressed in testimony, the toxicologist's report stated, without elaboration: "Cocaine is a central nervous system stimulant."

### C.   Legal Standard For Measuring Sufficiency

¶17   We now briefly address a threshold issue not specifically discussed by the parties in their briefing that involves the legal standards against which the evidence presented to the jury should be assessed for purposes of a sufficiency analysis.  An appellate court typically reviews the sufficiency of the evidence to support a criminal conviction by comparing the evidence with the legal standards set forth in the jury instructions used at trial, because the instructions given by the circuit court are typically accurate statements of the law.  *See Beamon*, 347 Wis. 2d 559, ¶22 ("Generally, when the jury instructions conform to the statutory requirements of that offense, we will review the sufficiency of the evidence by comparison to those jury instructions").  However, a different approach is employed when "erroneous instructions" are given, ones that "do not accurately reflect the statute enacted by the legislature."  *See id.*, ¶¶22-28; *State v. Williams*, 2015 WI 75, ¶¶47-49, 364 Wis. 2d 126, 867 N.W.2d 736.

¶18    Here, neither party suggests that we should diverge from the general rule that we compare the evidence to the instruction given based on our conclusion that the modified jury instruction created ambiguity regarding the "under the influence" element. Both sides took the position at oral argument that the correct sufficiency yardstick regarding the impaired-by-drugs offense is the prosecution theory described in the jury instruction given, not any other theory that could be pursued under WIS. STAT. § 346.63(1)(a). In other words, the parties agree that, in the words of *Williams*, the instructions here were not "erroneous" because they "'accurately state the statutory requirements for the crime charged' as applicable to the facts presented." *Williams*, 364 Wis. 2d 126, ¶57 (quoting *Beamon*, 347 Wis. 2d 559, ¶24 (emphasis omitted)). As the State acknowledged at oral argument, the prosecutors at trial agreed to a jury instruction that limited the prosecution theory to the allegation that McAdory operated a motor vehicle while under the influence of cocaine and THC.[9]

---

[9] To clarify, the State's positions at trial were not consistent regarding the basis for a jury finding that the State had proven the second element of the impaired-by-drugs offense. As noted in the text, the State approved the court giving an instruction that limited the prosecution theory to the proposition that impairment was caused by cocaine and THC. However, the prosecutor made passing references in closing argument which perhaps suggested that the jury should find McAdory guilty on the impaired-by-drugs offense based on signs that McAdory was intoxicated by alcohol. It remains, however, that the State in effect forfeited the opportunity to ask the jury to find that McAdory was "under the influence" due to alcohol or to some combination of cocaine, THC, and alcohol.

On a related note, as discussed further below, the jury here was instructed that the State had to prove that McAdory's "ability to operate" the car was "impaired because of consumption of" cocaine and THC. Logically, this could have meant impairment due to the consumption of cocaine alone, the consumption of THC alone, or the combined effects of consuming cocaine and THC. Therefore, each time we refer to the concept of the effects of "cocaine and THC" we are referring to any of these three alternatives.

### D.     The Impaired-By-Drugs Offense

¶19     The court instructed the jury in pertinent part as follows regarding what the State had to prove regarding the impaired-by-drugs offense:

> Section 346.63(1)(a) of the Wisconsin Statutes is violated by one who drives or operates a motor vehicle on a highway while under the influence of a controlled substance.
>
> … Before you may find the defendant guilty of this offense the State must prove by evidence which satisfies you beyond a reasonable doubt that the following two elements were present.  Number one, the defendant operated a motor vehicle on a highway….  Operate means the physical manipulation or activation of any of the controls of a motor vehicle necessary to put it in motion.  Number [two], [t]he defendant was under the influence of cocaine and Delta[-]9[-]tetrahydrocannabinol at the time the defendant operated a motor vehicle.  Cocaine and Delta[-]9[-] tetrahydrocannabinol are controlled substances.
>
> The definition of, quote, under the influence, closed quote[,] … means that the defendant's ability to operate a vehicle is impaired because of consumption of a controlled substance.  It is not required that impaired ability to operate be demonstrated by particular acts of unsafe driving.  What is required is that the person's ability to safely control the vehicle be impaired.
>
> If you are satisfied beyond a reasonable doubt that both elements of this offense have been proved you should find the defendant guilty.  If you are not so satisfied, you must find the defendant not guilty.

### E.     Analysis

¶20     There is no dispute regarding the State's proof on the first element of the impaired-by-drugs offense.  As reflected in the summary above, there was undisputed evidence that McAdory operated the car on a highway shortly before his arrest.

11

¶21     Regarding the second element—that McAdory was "under the influence of" cocaine and THC when he drove—McAdory does not now dispute that there was sufficient evidence that the sample about which the phlebotomist and the toxicologist testified contained his blood and that testing revealed the presence of at least some amounts of cocaine and THC.[10]

¶22     The issue regarding the second element of the impaired-by-drugs offense is whether the State presented sufficient evidence from which the jury could find that McAdory drove while "under the influence of cocaine and [THC]." More specifically, and stated in terms of the jury instruction quoted above, the issue is whether there was sufficient evidence that McAdory's "ability to operate" the car was "impaired because of consumption of" cocaine and THC. As the jury was instructed, "impaired ability to operate" need not "be demonstrated by particular acts of unsafe driving." Instead, "[w]hat is required is that the person's ability to safely control the vehicle be impaired." We first explain why we conclude that the evidence was sufficient to meet that standard, and then address specific arguments that McAdory makes to the contrary not already directly addressed in our initial analysis.

¶23     We conclude that the jury, aided in particular by numerous details reflected in the body camera video, had a reasonable basis to return a guilty verdict on the impaired-by-drugs offense. The first issue here is whether the jury had a reasonable basis to find that McAdory was "under the influence" of one or

---

[10] In challenging the sufficiency of the evidence regarding the impaired-by-drugs offense, McAdory does not raise as an issue his primary argument to the jury. The trial argument was that the State failed to prove beyond a reasonable doubt that the tested blood sample came from him: "Ladies and gentlemen of the jury, they got the wrong blood."

more substances that caused him to be unable to "safely control the vehicle" through inattention, distraction, incapacity, or other impairments. We conclude that the following evidence was sufficient to support a finding that he was not able to safely operate the car:

- The relatively long time he took to pull over after the officer, who was directly behind him in a squad car in the middle of the night, activated the emergency lights;

- His apparent accidental operation of his windshield wipers;

- His slightly slurred speech;

- His difficulty in answering some questions in a prompt, clear, and coherent way (although he did answer some questions reasonably clearly);

- The "nervousness" he appeared to exhibit;

- The fact that, in giving a false name, he used his real last name, which could be inferred to represent a lack of clear judgment, because providing his correct surname, which is not an especially common one, was not an effective way of hiding his identity;

- The fact that he "couldn't" give the officer his address when asked;

- His pointing gestures that did not appear to make sense;

- The fact that he got out of his car and started walking toward the squad car; and

- The fact that, shortly after complying with a direction to go back to his car, he got out of the car again and ran from police, creating a brief foot chase.

¶24    It is true that some of these indicia could be interpreted as reasonably supporting inferences other than an inability to safely operate the car— for example, that he was nervous about, or simply trying to avoid accountability for, the fact that he had been stopped while driving in a revoked status or while

possessing in his car an open receptacle containing an alcoholic beverage.  *See* WIS. STAT. § 346.935(2) and (3).  However, when considered together and in the context of all evidence in the light most favorable to the jury verdict, we conclude that a jury could reasonably infer that he was under the influence of one or more substances as that concept was expressed in the jury instructions.

¶25     Particularly notable are the timing and nature of McAdory's flight on foot from police.  The jury could have reasonably found that, in the context of other evidence that we have summarized, he impulsively bolted from the car in a state of mind that reflected a lack of clear judgment and self-control and had lowered inhibitions, such that he was unable to safely operate a motor vehicle.

¶26     But the question then becomes:  McAdory had an impaired ability to operate a vehicle *due to what cause or causes*?  What makes this a close case is the fact that, as McAdory strenuously points out, the jury did not have before it even a small amount of evidence regarding the particular impairing effects of the levels of cocaine and THC detected in the chemical test.  The officer's generic testimony about signs of "impairment" and the officer's conclusory assertions that McAdory was "impaired," quoted above, could have added little to whatever life experiences jurors or perceptions jurors might have brought to bear in their deliberations.

¶27     Further, while the jury was literally exposed to an exhibit reflecting the specific numbers of micrograms per liter of each controlled substance in McAdory's blood, there was no explanation from any source as to what those blood levels might signify in terms of potential effects on the average person, much less as more specifically tailored to the issue of McAdory's ability to safely control his car at the time of the stop.  Thus, as far the jury was informed, the

14

levels of cocaine and its metabolites and the amount of THC and its metabolites found in McAdory's blood sample could have represented virtually any spot on a continuum from (1) so minuscule as to be of no possibly impairing effect to (2) so massive as to be severely impairing beyond question. Barring some personal or professional knowledge that one or more jurors could have theoretically brought into the jury room (*e.g.*, a juror who was a nurse with education and experience regarding the typical effects on a person who has 130 micrograms of cocaine per liter of blood), the jury lacked a basis to assess the significance of the specific levels reflected in the toxicologist's report. We have no basis to speculate about any such juror knowledge.

¶28     The State acknowledged at oral argument that it could not point to specific trial evidence from which a juror could find, "'Oh, this is cocaine, [these are] the specific manifestations of cocaine.'" The State further acknowledged that the only witness at trial to address even the general topic of impairment, the officer, did not testify about potential impairment effects "specific to an individual['s use of a] controlled substance such as THC or cocaine."

¶29     However, we conclude that the extensive circumstantial evidence of impairment which the jury could reasonably attribute to the controlled substances was sufficient to overcome the lack of testimony based on science, experience, or observation regarding specific impairing effects of cocaine and THC. Three considerations in particular tip the scale on this issue in favor of a conclusion that the evidence was sufficient.

¶30     First, the jury had the benefit of learning that the blood sample tested negative for the presence of alcohol. This seemingly negated the otherwise theoretical possibility, based on the reported smell of alcohol on McAdory's

person and the open beer in the car, that he was under the influence of alcohol, and not of cocaine and THC.[11]

¶31 Second, together with the other signs of impairment, the jury could have reasonably decided to weigh heavily what it could have viewed as impulsive and reckless behavior of running from the police under these circumstances as a major sign of the impairing effects of cocaine and THC.

¶32 Third, it is within the common knowledge of jurors that a person *can*, after ingesting sufficient amounts of cocaine and THC, become unable to safely control a vehicle. We note in this regard that an exhibit informed the jury that cocaine is a "central nervous system stimulant," to the extent that this fact could not be considered to be common knowledge to a jury. McAdory urged us at oral argument to conclude that the jury here was left purely to speculate that the controlled substances here had an impairing effect. It is true that, unlike alcohol, both cocaine and marijuana are illegal substances to possess in Wisconsin, and therefore many jurors presumably have no firsthand or even secondhand knowledge regarding the likely or potential effects of cocaine and marijuana on their own or someone else's ability to safely operate a vehicle. However, at least in recent decades both controlled substances have been widely used in the United States, and the fact that they can have potentially debilitating or disorienting

---

[11] The no-alcohol blood test finding was potentially clouded by the possibly paradoxical finding of the cocaine metabolite cocaethylene, which the toxicologist testified is the product of biological processes only when both alcohol and cocaine are present in the person's system. But assuming all inferences in favor of the verdict, as we must, the jury could have reasonably resolved the seeming paradox by inferring that the biological processes that produce cocaethylene can be triggered by only tiny amounts of alcohol, or by inferring that persistence of cocaethylene in the body is relatively long compared to the persistence of alcohol.

effects has been widely written about and discussed. The collective understanding of 12 citizens that these controlled substances have potential impairing effects, depending on all circumstances, would be based on common knowledge, experience, and common sense. Further, while not strong evidence in itself, the jury had the benefit of testimony that cocaine can typically be detected in the blood for up to eight hours after ingestion, permitting the inference that McAdory had ingested cocaine sometime on the night that he was stopped (*i.e.*, ingesting cocaine at some time or times after approximately 7:05 p.m., eight hours before the blood draw).

¶33    McAdory argues that the verdict had to rest on mere speculation, because virtually all of the evidence that we summarize above as bearing on the impairment topic could relate solely to the effects of the consumption of alcohol, and not to impairment as a result of consumption of cocaine and THC. In support of this position, McAdory points out that the officer here did not conduct "field sobriety tests or any other standardized tests to measure [McAdory's] impairment by a controlled substance," and that the officer did not testify that he had been "trained as a drug recognition evaluator or that he or any other officer implemented the Drug Recognition Evaluation (DRE) protocol to evaluate whether [he] was impaired by a controlled substance."[12]

---

[12] As McAdory notes, quoting *State v. Chitwood*, 2016 WI App 36, 369 Wis. 2d 132, 879 N.W.2d 786, the DRE is a nationally recognized 12-step protocol for detecting impairment based on drugs in the body based on observed signs and symptoms. *See id.*, ¶¶31, 49. In *Chitwood*, we affirmed the admissibility of the expert opinion of a drug recognition evaluator that the defendant was incapable of operating a motor vehicle safely as a result of being under the influence of a narcotic analgesic and a central nervous system depressant. *See id.*, ¶52.

¶34     We have explained why we consider this a close issue and how McAdory has identified deficits in the evidence. It is true that no standardized test was used, and we have acknowledged that the generalized testimony on the impairment topic that the prosecutor elicited from the officer in itself had little substance. But we have also explained why we conclude that one reasonable inference based on the jury's collective common knowledge, experience, and common sense was that he was "under the influence," as defined in the jury instruction as given, due to the effects of cocaine and THC. McAdory fails to persuade us that the only reasonable inference from the evidence was that, if he was under the influence, it had to be due to alcohol or some other cause and not due to cocaine and THC.

¶35     McAdory points out that, under the pattern jury instruction tailored to driving under the influence of alcohol, the jury is told that it may find, based solely on an admitted blood test showing a blood alcohol concentration of .08 or more, that defendant was "under the influence" at the time of the alleged driving, while the equivalent instruction for driving under the influence of a controlled substance contains no such provision. *Compare* WIS JI—CRIMINAL 2663 *with* WIS JI—CRIMINAL 2664. However, McAdory's point in citing this difference seems to be only to establish the following uncontested points, which do not undermine our conclusion: when the State charges the impaired-by-drugs offense, it is never relieved of its burden to prove impairment because of drug use, and it cannot rely exclusively on the inferences created by the mere fact that a particular level of a controlled substance was detected in a blood sample.

¶36     At oral argument, McAdory made the general point that, depending on all circumstances, a given person's judgment "as to other affairs of life could be impaired" while that person's "ability to safely maintain control of the vehicle

18

could still be intact." This may have been a reasonable argument for the defense to make to the jury in this case. But under our standard of review we must assume that the jury decided that McAdory was not such a person at the time of the stop, based on evidence that could support reasonable inferences that his ability to safely maintain control of his car was not intact due to the influence of cocaine and THC.

¶37    In sum, given the combination of significant indicia of impairment summarized above and the fact that cocaine and THC were in his system, the evidence was sufficient under the "highly deferential" legal standard.

## II.    DUE PROCESS

¶38    McAdory argues that his conviction for the impaired-by-drugs offense violates his right to due process. His argument is that, based on multiple trial events that include the circuit court's modification of the instruction defining "under the influence," there is a reasonable likelihood that the jury did not understand what the State needed to prove to establish that he was "under the influence" of cocaine and THC at the time of the stop. More specifically, McAdory argues that the jury would have been misled into confusing the elements of the impaired-by-drugs offense with the elements of the strict-liability offense and concluding that McAdory was guilty of the impaired-by-drugs offense merely because there was a detectable amount of cocaine and THC in his blood, whether or not he was "under the influence" of cocaine and THC. The State acknowledges that it appears that the circuit court and the parties at trial "at times conflated" the impaired-by-drugs offense and the strict-liability offense. But the State contends that, nevertheless, McAdory fails to show a reasonable likelihood that the jury applied the modified instruction in a manner that violated his right to due process.

We conclude that McAdory has shown that the modified instruction was ambiguous in the context of this case and that the jury was unconstitutionally misled about the State's burden to prove that he was under the influence of controlled substances, given the multiple, significant, uncorrected missteps.

## A.   Legal Standards

¶39    Our supreme court has explained that a defendant seeking to establish that a deficient jury instruction contributed to the jury being "unconstitutionally misled" in violation of his or her due process rights must make two showings.  *State v. Badzinski*, 2014 WI 6, ¶37, 352 Wis. 2d 329, 843 N.W.2d 29.  First, "'that the instruction was ambiguous,'" and second, "'that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.'"  *Id.* (quoting *State v. Burris*, 2011 WI 32, ¶48, 333 Wis. 2d 87, 797 N.W.2d 430, which in turn quoted *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009)).[13]  In this context, "we consider the instruction 'in light of the proceedings as a whole, instead of viewing a single instruction in artificial isolation.'" *Badzinski*, 352 Wis. 2d 329, ¶¶38, 40 (quoting *State v. Lohmeier*, 205 Wis. 2d 183, 193, 556 N.W.2d 90 (1996)).

¶40    Our supreme court has explained that

> "Wisconsin courts should not reverse a conviction simply because the jury possibly could have been misled," [*Lohmeier*, 205 Wis. 2d at 193], or based on some "ambiguity, inconsistency, or deficiency" in the instruction,

---

[13]  As the jury here was correctly instructed, the burden establishing every fact necessary to constitute guilt is upon the state.  *See In re Winship*, 397 U.S. 358, 363-64 (1970).

> [*Sarausad*, 555 U.S. at 190], (quoting *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)). The reasonable likelihood standard demands that the defendant articulate something more than an ambiguity or a possibility that the jury was misled .…

*Burris*, 333 Wis. 2d 87, ¶62 n.13.

### B.    Additional Background

¶41    Before addressing particular aspects of the trial that are relevant to the due process analysis, we briefly address the terms "intoxicant" and "intoxication."   These terms are pertinent to our discussion regarding the likelihood of jury confusion.   In common usage, "intoxicant" sometimes means "alcoholic beverage."   Consistent with this common usage, WIS. STAT. § 346.63(1)(a) distinguishes between a person being under the influence of "an intoxicant" and a person being under the influence of a "controlled substance" or "a controlled substance analog," treating them as distinct items for consumption. However, the legislature has provided a definition of "under the influence of an *intoxicant*" that includes alcoholic beverages and controlled substances alike:

> "Under the influence of an intoxicant" means that the actor's ability to operate a vehicle … is materially impaired because of his or her consumption of an alcohol beverage, hazardous inhalant, of a controlled substance or controlled substance analog under [WIS. STAT.] ch. 961, of any combination of an alcohol beverage, hazardous inhalant, controlled substance and controlled substance analog, or of any other drug, or of an alcohol beverage and any other drug.

WIS. STAT. § 939.22(42); *see also* **State v. Duewell**, Nos. 2015AP43-CR, 2015AP44-CR, unpublished slip op., ¶19 (WI App Mar. 23, 2016) (concluding that "intoxicant" in § 346.63(1)(a) includes "any substance that has an intoxicating effect").

21

¶42     The WIS. STAT. § 939.22(42) definition comes into play here for the following reasons.  The impaired-by-drugs count in the amended information was labeled "operating while *intoxicated*."  Nevertheless, as discussed above, the State allowed the circuit court to instruct the jury as if the only prosecution theory on the impaired-by-drugs offense was that McAdory operated his car while he was under the influence of cocaine and THC.  The State's denomination of the impaired-by-drugs offense in the criminal information as charging McAdory with operating while *intoxicated* was consistent with the § 939.22(42) definition.  At the same time, we use the phrase "impaired-by-drugs offense" to maintain a focus on what the State had to prove at trial regarding the impaired-by-drugs offense based on what the State concedes was the sole prosecution theory:  that McAdory was operating under the influence of cocaine and THC.

*Opening Statements*

¶43     The prosecution's opening statement was brief.  We now reproduce it in full, with emphasis added to passages that could have caused the jury to find McAdory guilty of the impaired-by-drugs offense based only on determinations that he drove when he had a detectable amount of controlled substance in his system:

> Ladies and gentlemen, thank you for being here today.  Now, oftentimes we get up here and we tell you how this case is going to be like a puzzle.  How there is all these different piece[s] of evidence out there.  How it's your job to listen to them, weigh the credibility as you evaluate these statements that don't always seem to be the same.  And then put it together, create this picture that shows that the defendant is guilty beyond a reasonable doubt. Except for that last part this is not that case.  In this case the evidence will show quite clearly that Mr. McAdory is guilty of *the charge of the offenses* beyond a reasonable doubt.  At this time *I ask you to pay particularly close*

*attention to the evidence surrounding the operating while intoxicated charge.*

But *there are two things. First, the defendant had to be driving. And, second, that he had a detectible amount of controlled substances in his system.* As to the first, we will play you footage from the arresting officer's body camera which will show you that he was, in fact, driving. That footage will also show him provide a false name, exit the vehicle and take off running. After he is apprehended he was then transported to the hospital. *And that's where we get into that second element, the detectible amount of controlled substance. We will put on our second witness who is a nurse who performed a blood draw and she will go through how that happened.* The procedures that take the blood. Procedures to care for it, to make sure that it is, in fact, this defendant's blood. And then we will have the testimony from the phlebotomist. The person at the Crime Lab who tested this blood. *And he'll tell you that it tested positive for not one but two controlled substances. Cocaine and Delta 9 THC, the active ingredient in marijuana. And when that's done, sometime after lunch today, we'll come back here and we will each present our closing arguments tying all the evidence together, maybe going into a little bit more detail about what you heard.* Then we turn it over to you. And we ask you to do your part in this whole business. And that's to look at that evidence that we laid out there for you, and evaluate it and say, *if you believe that the elements of the offense are met, defendant was driving, had a detectible amount of controlled substance was in his system, then you do what you must do.* You find the defendant guilty beyond a reasonable doubt and submit *a verdict of guilty* to this Court. Thank you.

### *Closing Arguments*

¶44    The prosecution's initial closing argument was also brief and we reproduce it also, with emphasis added on problematic passages:

So here we are. Back at the point that we said we would get to where now it's your job to evaluate the evidence that's come in. I just want to break it down a little bit. First talk about that obstruction charge. You saw Mr. McAdory run from the police in the footage. You heard earlier that no one is disputing that.

23

*So that brings us to the OWI. And there I asked you to remember or pay attention to two things. Was the defendant driving? And did he have a detectible amount of controlled substances in his system.* Now just because there has been a lot today let[']s run back through. You heard Officer Bier testify that he saw a car driving through residential neighborhoods that night with one headlight out. So he initiated a stop. He had to follow that car for two blocks before it pulled over. Finally did. He gets up. Goes to the car. Sees the windshield wipers are on. And observes the driver who he identified as Mr. McAdory. *And believes that he is impaired. Intoxicated in some way. That's through his behavior and the fact that he smelled an odor of intoxicants. That odor makes sense. You consider later he found a beer in the car.*

But he continued and so he took a name from the driver. Gary McAdory. [The] officer goes back to his car. Tries to run that name. Sees the defendant get out of the car. Start walking towards him before getting back in. Officer Bier returns putting that name in. Then the defendant gets out of the car and runs.

So after he was apprehended you saw Officer Bier's statement through the footage that he continued to believe that Mr. McAdory *was intoxicated.* And at the hospital he read the forms he needed to do. The nurse took the blood draw. Coordinated the proper procedures. Followed all those procedures and Officer Bier was there the entire time. Observing Mr. McAdory. His opinion *as to his intoxication* never changed.

So in that we had element number one. Driving the motor vehicle. *So where we just left off was the nurse taking the blood draw. Well, we know that got sent over to the toxicology lab. Tests were performed. All the peer review procedures you heard. Toxicologist with twenty-two and a half years['] experience get up here and tell you what he found. He told you that he found cocaine. And that the analyst who he peer reviewed found Delta 9 THC. Two controlled substances. So there you have both elements of the offense.*

So why did I bring up the impairment? Well that's because of the other charge in the verdict form which you'll see. *You do have the option of finding him guilty on the impairment, as well.* That he was impaired while he was driving. However, remember, for the charge of operating with an amount of controlled substances there is only two elements. *That he was operating and that he had a*

24

> *detectible amount of controlled substances in his system at the time. And we put those facts in evidence. Those facts are not disputed. That testimony was uncontroverted. You heard Officer Bier say that he saw him driving. You saw the footage which showed him driving. You saw the defendant's behavior. And then you heard the testimony that there were two controlled substances in his system. And that evidence right there shows beyond a reasonable doubt that Mr. McAdory is guilty of the charged offense. So we ask you now to do your job. To evaluate that evidence and if you so believe then the only thing to do is to find Mr. McAdory guilty. Thank you.*

¶45 The prosecutor's rebuttal closing argument only served to reinforce the negative effects of the prior inaccurate statements. It concluded with the following:

> So we come back to those two things. Was he driving? Yes. Did he have a detectible amount of controlled substance in his system? Yes. That evidence is in. There is no other reasonable hypothesis except that Mr. McAdory is guilty of operating while intoxicated. So we ask you to follow that evidence and return a verdict of guilty. Thank you.

### *Jury Instructions*

¶46 As part of his due process argument, McAdory challenges the circuit court's modification of the standard pattern for operating a motor vehicle while under the influence of a controlled substance, WIS JI—CRIMINAL 2664. This is the substantive instruction for the impaired-by-drugs offense. The pattern instruction states in its entirety, with emphasis now added to the paragraph that the court decided to drop:

> **Statutory Definition of the Crime**
>
> Section 346.63(1)(a) of the Wisconsin Statutes is violated by one who drives or operates a motor vehicle on a highway while under the influence of a controlled substance.

**State's Burden of Proof**

Before you may find the defendant guilty of this offense, the State must prove by evidence which satisfies you beyond a reasonable doubt that the following two elements were present.

**Elements of the Crime That the State Must Prove**

1. The defendant (drove) (operated) a motor vehicle on a highway.

**Definition of "Drive" or "Operate"**

["Drive" means the exercise of physical control over the speed and direction of a motor vehicle while it is in motion.]

["Operate" means the physical manipulation or activation of any of the controls of a motor vehicle necessary to put it in motion.]

2. The defendant was under the influence of (name controlled substance) at the time the defendant (drove) (operated) a motor vehicle.

[(Name controlled substance) is a controlled substance.]

**The Definition of "Under the Influence"**

"Under the influence" means that the defendant's ability to operate a vehicle was impaired because of consumption of a controlled substance.

*[Not every person who has consumed (name controlled substance) is "under the influence" as that term is used here.]*[14] *What must be established is that the*

---

[14] Regarding the bracketed sentence, the committee adds the following comment in what is footnote 9 of the pattern instructions in WIS JI—CRIMINAL 2664:

> The sentence in brackets is appropriate for cases involving the consumption of substances which are roughly similar in their effect on a person as alcohol. That is, a person could use some substances in a limited degree and, like the person who consumes a limited amount of alcohol, not be "under the influence" as that term is used here.

(continued)

> *person has consumed a sufficient amount of (name controlled substance) to cause the person to be less able to exercise the clear judgment and steady hand necessary to handle and control a motor vehicle.*
>
> It is not required that impaired ability to operate be demonstrated by particular acts of unsafe driving. What is required is that the person's ability to safely control the vehicle be impaired.

**Jury's Decision**

> If you are satisfied beyond a reasonable doubt that both elements of this offense have been proved, you should find the defendant guilty.
>
> If you are not so satisfied, you must find the defendant not guilty.

¶47 It is difficult to track pertinent discussion by the parties and the circuit court in the transcript of the jury instruction conference because of a number of confusing statements. However, all that matters for our analysis is that the court decided the following. It would give the pattern instruction but, over the objection of defense counsel and at the general urging of the prosecutor, the court modified it to remove the middle paragraph of the passage defining "under the influence" that we highlighted with italics above. The result was that the court gave the jury the pattern as reproduced above, except that for the definition of "under the influence," the court gave only the language that we now reproduce as (1), and the jury was not given what we now reproduce as (2):

(1) *Given*: "The definition of, quote, under the influence, closed quote. Under the influence means that the defendant's ability to operate a vehicle is impaired because of consumption of a controlled substance. It is not required that impaired ability to operate be demonstrated by

---

Some controlled substances, however, have such extreme effects that the sentence in brackets should not be used.

27

particular acts of unsafe driving. What is required is that the person's ability to safely control the vehicle be impaired."

(2) *Not given*: [Not every person who has consumed (name controlled substance) is "under the influence" as that term is used here.] What must be established is that the person has consumed a sufficient amount of (name controlled substance) to cause the person to be less able to exercise the clear judgment and steady hand necessary to handle and control a motor vehicle.

### C.    Analysis

¶48    We now explain why we conclude that it is reasonably likely that the jury applied the modified instruction in an unconstitutional manner in light of the proceedings as a whole. We first explain ambiguous aspects of the modified instruction and then address other problematic aspects of the proceedings. Putting these topics together, we conclude that the modified instruction was inadequate given the manner in which the case was tried. Finally, we address the State's arguments to the contrary that we have not already directly addressed by that point.

### *Modified Instruction*

¶49    The circuit court here modified the work of the Criminal Jury Instructions Committee, which we are to view as "persuasive," but "not infallible." *See State v. Waalen*, 130 Wis. 2d 18, 26, 386 N.W.2d 47 (1986), *abrogated by State v. Hubbard*, 2008 WI 92, ¶¶45-47, 313 Wis. 2d 1, 752 N.W.2d 839. While circuit courts have "wide discretion in developing the specific language of jury instructions," it is prudent for circuit courts to consider whether variations from pattern instruction are necessary "because they do represent a painstaking effort to accurately state the law and provide statewide uniformity." *See State v. Foster*,

191 Wis. 2d 14, 26-27, 528 N.W.2d 22 (Ct. App. 1995). We now summarize pertinent case law background for the language selected by the committee.

¶50    Our supreme court extensively addressed the history of Wisconsin statutes prohibiting operating while under the influence of alcohol and other substances and corresponding jury instructions that have defined the element of "under the influence" in **Hubbard**. In **Hubbard**, the defendant allegedly drove while under the influence of the prescription medication Xanax (Alprazolam). *See* **Hubbard**, 313 Wis. 2d 1, ¶6. Given the limited arguments of the parties here on this topic, it is sufficient for current purposes to note just two points made by the court in **Hubbard**. These two points establish that the circuit court here omitted meaningful language that the committee has adopted from legal standards approved by our supreme court.

¶51    First, our supreme court in **Hubbard** favorably quoted the following instruction that was given by the circuit court in that case:

> "Under the influence" means that the defendant's ability to operate a vehicle was materially impaired because of consumption of a prescription medication.
>
> Not every person who has consumed Xanax or alprazolam is "under the influence" as that term is used here. What must be established is that the person has consumed a sufficient quantity of Xanax or alprazolam to cause the person to be less able to exercise the clear judgment and steady hand necessary to handle and control a motor vehicle.
>
> It is not required that impaired ability to operate be demonstrated by particular acts of unsafe driving. What is required is that the person's ability to safely control the vehicle is materially impaired.

*Id.*, ¶11.

¶52 Second, the court in *Hubbard* noted that it had "previously endorsed" the "under the influence" definition given in *Fond du Lac v. Hernandez*, 42 Wis. 2d 473, 167 N.W.2d 408 (1969), and stated in *Hubbard* that the following was an "acceptable means for a circuit court to instruct a jury regarding the definition of 'under the influence'" in the alcohol intoxication context:

> The expression "under the influence of an intoxicant" covers not only all the well-known and easily recognized conditions and degrees of intoxication, but any abnormal mental or physical condition which is the result of indulging in any degree in intoxicating liquors, including beer, and which tends to deprive him of that clearness of intellect and control of himself which he would otherwise possess.
>
> A person who is even to the slightest extent under the influence of an intoxicant in the common and well-understood acceptation of the term is—to some degree at least—less able either mentally or physically, or both, to exercise the clear judgment and steady hand necessary to handle as powerful and dangerous a mechanism as a modern motor vehicle with safety to himself and the public. Not every man who has consumed alcoholic beverages falls within the ban of the statute. If that consumption of alcoholic beverages does not cause him to be influenced in the ordinary and well understood meaning of the term, he is not under the influence of an intoxicant within the meaning of the statute or ordinance in this particular case.

*See Hubbard*, 313 Wis. 2d 1, ¶¶31 & n.9, 44, 54 (quoting *Hernandez*, 42 Wis. 2d at 475-76 and citing approval of this instruction in *Waalen*, 130 Wis. 2d at 26).

¶53 It is evident that the instruction language from the *Hubbard* and *Hernandez* cases defining "under the influence" that has been favorably cited by our supreme court provided the basis for some of the language included in the pattern instruction that the circuit court omitted in this case. After McAdory points out that the omitted language contains clues to a meaning of "under the

influence" that could be helpful to a defendant, the State has little to say on the topic of precedent and merely suggests in a conclusory manner that the instruction as modified was adequate when compared with traditionally approved instructions.

¶54  We begin our discussion of the instruction as given by noting that, during oral argument, the State conceded that nothing in the omitted pattern instruction language was inaccurate or inappropriate to give in this case and further conceded that the circuit court could have given the optional first sentence. With that first sentence, the omitted paragraph would have explained the following to the jury:

> Not every person who has consumed cocaine and THC is "under the influence" as that term is used here. What must be established is that the person has consumed a sufficient amount of cocaine and THC to cause the person to be less able to exercise the clear judgment and steady hand necessary to handle and control a motor vehicle.

¶55  The circuit court's modification of the pattern Criminal Jury Instruction 2664 presented the jury with an accurate statement of the elements of the offense, and it gave definitions of terms used in the elements. However, it was incomplete and therefore ambiguous for purposes of this case to the extent that it failed to inform the jury of two related propositions. As we now proceed to explain, the two propositions missing from the modified instruction were:  (1) not every person who has consumed cocaine and THC is "under the influence"; and (2) a person is not "under the influence" unless he or she has consumed "*a sufficient amount of cocaine and THC to cause* the person to be less able to exercise *the clear judgment and steady hand necessary* to handle and control a motor vehicle." (Emphasis added.)

¶56    As to the first proposition, the jury here was not explicitly informed that it could not find McAdory guilty based merely on a finding that he had consumed cocaine and THC before driving.[15]    As to the second proposition, "sufficient amount" would have underscored for the jury that some amounts would *not* be sufficient to cause the level of impairment that the State needed to prove. "Clear judgment and steady hand necessary to handle and control a motor vehicle" is a reasonably concrete formulation to convey what impairment looks like in the context of driving.  For example, a juror reflecting on that language might decide in a given case that some alleged indicia of impairment did *not* render the defendant's judgment unclear, or render the defendant's "hand" unsteady, for purposes of safely controlling a vehicle.

¶57    The circuit court gave instructions that correctly distinguished between the impaired-by-drugs offense and the strict-liability offense.  However, the missing propositions from the definition of "under the influence" for the impaired-by-drugs offense created ambiguity and contributed to create the due process violation in the proceedings as tried.  We now explain further.

---

[15] This contrasts sharply with what the jury was asked to determine regarding the strict-liability offense.  There is no dispute that the circuit court accurately instructed the jury on that offense.  The court informed the jury that WIS. STAT. § 346.63(1)(am) prohibits driving on a highway while the driver "has a detectible amount of a restricted controlled substance in his or her blood."  *See* WIS JI—CRIMINAL 2664B (standard pattern instruction for operating a motor vehicle with a detectable amount of a restricted controlled substance).  As with the impaired-by-drugs offense, the first of two elements for the strict-liability offense is that the defendant operated a motor vehicle on a highway.  *See id.*  However, the second element required the State to prove only that McAdory drove with a detectible amount of a restricted controlled substance in his blood and not that he was "under the influence" of that substance.  *See id.*

*Proceedings*

¶58    The prosecution's opening statement, as quoted in full above, misled the jury.  The prosecutor spoke of "the *charge* of the offenses," which awkwardly suggested that there was only one "charge" for the jury to be concerned with when it came to evidence regarding McAdory driving after allegedly using controlled substances.  Reinforcing that inaccurate framing, the prosecutor then informed the jury that, in order to prove "the operating while intoxicated charge" (*i.e.*, the impaired-by-drugs offense) the State needed to prove only that (1) McAdory drove and (2) "he had a detectible amount of controlled substances in his system.*"*  The prosecution could scarcely have been clearer, or more inaccurate, in driving home the proposition that the State's case would be won as soon as it proved those two elements beyond a reasonable doubt, and then the jury would return "a verdict of guilty" as to this "charge."

¶59    Compounding the problem, these misstatements were not countered by any statement in the defense attorney's short opening statement nor by direct correction from the circuit court that identified the opening as misleading, leaving the jury to assume that the prosecutor had accurately stated what the State had to prove at trial.

¶60    We need not repeat here our detailed discussion of the trial evidence given above in our discussion addressing the sufficiency issue.  The jury was presented with evidence showing impairment from some cause or causes, but it was just barely sufficient to raise reasonable inferences on the topic of whether McAdory was "under the influence of" cocaine and marijuana, as that concept was defined for the jury.  The amounts of micrograms per liter of the controlled substances were not given significance by any witness or admitted document.

¶61    Turning to the closing arguments, the prosecutor repeated the same misstatements of law from the opening statement in both the initial closing and the rebuttal closing.  This reinforced an inaccurate view of what the State had to prove regarding the "under the influence" element of the impaired-by-drugs offense.  As with the opening, the prosecutor suggested that the only questions before the jury were whether the defendant drove and "did he have a detectible amount of controlled substances in his system[?]"  After referring to those two issues, the prosecutor said, "So there you have both elements of *the* offense," and closed by arguing that McAdory was guilty of "*the* charged offense."  This suggested to the jury that there was only one issue for the jury to decide on both the driving-related offenses:  Was there a detectable amount of the controlled substances in his blood? A jury that had already been misled by the prosecution on this topic, without correction by the defense or the circuit court, could have reasoned that there was no need for evidence about the significance of the levels of the controlled substances in the blood because guilt on both offenses was established by the presence of controlled substances in the blood of the driver.  The prosecution closing also confusingly referenced signs of intoxication by use of alcohol, and did not refer to any specific impairing effect that could have been caused by the controlled substances.

¶62    As quoted fully above, the prosecutor's initial closing included this statement:

> So why did I bring up the impairment?  Well that's because of the other charge in the verdict form which you'll see.  You do have the option of finding him guilty on the impairment, as well.  That he was impaired while he was driving.  However, remember, for the charge of operating with an amount of controlled substances there is only two elements. That he was operating and that he had a detectible amount of controlled substances in his system at

> the time. And we put those facts in evidence. Those facts are not disputed.

This passage hinted at the existence of two distinct driving-related charges, but it did not begin to correct the prior misleading statements. It certainly did not make it clear that, contrary to what the prosecutor had already told the jury, the jury could not find McAdory guilty of the impaired-by-drugs offense if the State did not prove beyond a reasonable doubt that he was in fact under the influence of the controlled substances at the time of the stop.

¶63 As with the opening statements, the defense attorney's closing argument contained no refutation of the misstatements in the prosecutor's closing argument nor did the circuit court correct it.

¶64 Putting together the ambiguous aspects of the instruction with the deeply problematic trial events, we conclude that this created a reasonable likelihood that the jury did not understand the burden that the State had in proving the "under the influence" element of the impaired-by-drugs offense. The jury was told by the prosecutor repeatedly, inaccurately, that *all* that mattered on the second element of the impaired-by-drugs offense was that there were detectible amounts of the controlled substances in McAdory's blood. The jury was given no reason to attribute any significance to the levels of controlled substances in the blood. Then, it was given instructions that omitted statements that not every person who has consumed cocaine and THC is necessarily "under the influence" and that the State must show that the person consumed "a sufficient amount of cocaine and THC to cause the person to be less able to exercise the clear judgment and steady hand necessary to handle and control a motor vehicle."

¶65    In other cases, the particular instruction language that was omitted here might not contribute to the creation of a due process violation. But here the prosecution, uncorrected, left the strong impression that mere consumption of cocaine and THC necessarily constitutes being "under the influence," and there was no evidence based on science, experience, or observation regarding what might constitute "a sufficient amount of" a controlled substance to cause a person to be under the influence.

¶66    As McAdory argues, he need not show that the jury in fact believed that the impaired-by-drugs offense had identical elements to the strict-liability offense, even though the prosecutor repeatedly said words to this effect. The issue is whether, in light of ambiguity in the instruction given and the nature of this case, there is a reasonable likelihood that trial events caused the jury "to apply the instruction in a way that relieved the State of its burden to prove every element of the crime beyond a reasonable doubt." *See Sarausad*, 555 U.S. at 193. We conclude that the misdirection and inadequate direction that we have described meet that standard.

¶67    We turn to arguments by the State that we may not have directly rejected in our discussion to this point. The State makes the narrow argument that the modified instruction was adequate and could not have contributed to a due process violation because the definition of "under the influence" was generally accurate. But the argument fails to come to grips with the reasonable likelihood of a due process violation arising from the combined negative effects of the misdirection and inadequate direction that we have described. The State in its briefing speaks of the jury being "fully and fairly informed of the definition of 'under the influence.'" *See State v. Neumann*, 2013 WI 58, ¶89, 348 Wis. 2d 455, 832 N.W.2d 560 ("circuit court must … 'exercise its discretion in order to fully

and fairly inform the jury of the rules of law applicable to the case and to assist the jury in making a reasonable analysis of the evidence.'"). But we have explained why we conclude that the instruction did not "fully" state the law in the context of this case.

¶68 The State argues that a question asked by the jury during deliberation—"Can we please have a definition of operating while intoxicated or is it the same as operating under the influence of a controlled substance?"—"actually demonstrates that the jury understood the meaning of 'under the influence.'" We do not follow this argument. The question could have reflected confusion about the charges and in any case it suggests no knowledge about a full understanding of the "under the influence" element.

¶69 The State emphasizes the facts that the jury received separate instructions for the impaired-by-drugs and the strict-liability offenses, and that it received verdict forms on each offense. We question whether these facts in themselves carry weight against a due process violation, because the jurors were not given any special direction to the effect that the two driving-related charges were distinct. We generally assume that jurors do their best to follow instructions given by circuit courts. *See State v. Anthony*, 2015 WI 20, ¶89, 361 Wis. 2d 116, 860 N.W.2d 10. However, the jury here, in simply trying to follow the directions from the circuit court, might well have gotten the idea that the prosecutor was giving sound direction in repeatedly telling them that the only contested issue was whether there was a detectable amount of controlled substances in the blood. Thus, it is at least reasonably likely that, having been concretely and repeatedly misdirected by the prosecution, without direct correction, jurors lost sight of or reached the wrong idea about the second element of the impaired-by-drugs offense, especially when there was no evidence or argument about specific

37

impairing effects of cocaine and THC. Except for the circuit court's reading elements-accurate instructions, the issue essentially vanished at trial, just as the prosecutor essentially predicted that it would in the opening statement. The circuit court's bare recitations of the elements and the verdict forms were not sufficient given how this case was tried.

¶70 The State makes an undeveloped harmless error argument, contending that "[a]ny lay person knows generally what 'under the influence' means." We do not address this argument, which we would have to construct on behalf of the State. *See Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("[W]e will not abandon our neutrality to develop arguments.").

## CONCLUSION

¶71 For all of these reasons, we conclude that there was sufficient evidence to support the conviction for a violation of WIS. STAT. § 346.63(1)(a) but we reverse the judgment of conviction for a violation of § 346.63(1)(a) based on a violation of McAdory's right to due process. Accordingly, we remand for a new trial on the § 346.63(1)(a) charge.

*By the Court*.—Judgment reversed and cause remanded.